AO 106 (Rev. 04/10) Application for a Search Warrant *(Page 1)*

## UNITED STATES DISTRICT COURT
for the
Northern District of New York

| | |
|---|---|
| In the Matter of the Search of | ) |
| *(Briefly describe the property to be searched or identify the person by name and address)* | ) ) |
| THE PREMISES KNOWN AND | ) |
| DESCRIBED AS 3 OREGON TRAIL, | ) |
| WATERFORD, NY 12188, INCLUDING | ) |
| ANY LOCKED AND CLOSED CONTAINERS | ) |
| AND CLOSED ITEMS CONTAINED | ) |
| THEREIN | ) |

Case No.   1:18-MJ- 164   (DJS)

### APPLICATION FOR A SEARCH WARRANT

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property: *(identify the person or describe the property to be searched and its given location)*:

Please see Attachment A.

located in the ____Northern____ District of ____New York____ , there is now concealed *(identify the person or describe the property to be seized)*:

Please see Attachment B.

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

☒   evidence of a crime;
☒   contraband, fruits of crime, or other items illegally possessed;
☒   property designed for use, intended for use, or used in committing a crime;
☐   a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 18 U.S.C. § 1591; | Sex trafficking by force, fraud or coercion and interference in an |
| 18 U.S.C. § 1589; | investigation into sex trafficking by force, fraud or coercion; forced |
| | labor; |

The application is based on these facts:

Please see attached affidavit.

☒   Continued on the attached sheet.
☐   Delayed notice of ____ days (give exact ending date if more than 30 days):   Click here to enter a date.
is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

AO 106 (Rev. 04/10) Application for a Search Warrant *(Page 2)*

_Applicant's signature_

FBI Special Agent Michael Lever

_Printed name and title_

Sworn to before me and signed in my presence.

Date:     March 26, 2018

_Judge's signature_

City and State:     Albany, NY          Hon. Daniel J. Stewart, U.S. Magistrate Judge

_Printed name and title_

AL:MKP
F. #2017R01840

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK
– – – – – – – – – – – – – – – – – – X

IN THE MATTER OF THE SEARCH OF      FILED UNDER SEAL
THE PREMISES KNOWN AND
DESCRIBED AS 3 OREGON TRAIL,      AFFIDAVIT IN SUPPORT OF
WATERFORD, NY 12188, INCLUDING      APPLICATION FOR A
ANY LOCKED AND CLOSED      SEARCH WARRANT
CONTAINERS AND CLOSED ITEMS
CONTAINED THEREIN

– – – – – – – – – – – – – – – – – X

NORTHERN DISTRICT OF NEW YORK, SS:

       MICHAEL LEVER, being first duly sworn, hereby deposes and says that he is

a Special Agent with the Federal Bureau of Investigation ("FBI"), duly appointed according

to law and acting as such.  Upon information and belief, there is probable cause to believe

that there is located in THE PREMISES KNOWN AND DESCRIBED AS 3 OREGON

TRAIL, WATERFORD, NY 12188 (the "SUBJECT PREMISES") INCLUDING ANY

LOCKED AND CLOSED CONTAINERS AND CLOSED ITEMS CONTAINED THEREIN,

further described in Attachment A, the things described in Attachment B, which constitute

evidence, fruits and instrumentalities of violations of, among other crimes, 18 U.S.C. § 1591

(sex trafficking by force, fraud or coercion and interference in an investigation into sex

trafficking by force, fraud or coercion) and 18 U.S.C. § 1589 (forced labor), 18 U.S.C. § 1952

████████████████████████████████████████████████████

████████████████████████ (collectively, the "Subject Offenses").

The source of your deponent's information and the grounds for his belief are as follows:[1]

1.     I am a Special Agent with the Federal Bureau of Investigation (the "FBI") and have been since 2015.  During my tenure with the FBI, I have participated in long-term investigations into civil rights violations and other crimes, during the course of which I have conducted physical and electronic surveillance, executed search warrants, reviewed and analyzed location data and reviewed and analyzed numerous taped conversations and debriefed cooperating witnesses.

2.     I am familiar with the facts and circumstances of this investigation from, among other sources: (a) my personal participation in this investigation; (b) reports made to me by other law enforcement personnel; (c) interviews with witnesses; and (d) the review of records, documents and reports.  Where I rely on statements made by others, such statements are set forth in sum and substance and in part unless otherwise indicated.

<u>SUBJECT PREMISES</u>

3.     **The SUBJECT PREMISES** is a two-story residential property, color brown.  The residence is accessible via a driveway which leads to a single garage.  There is a walkway which leads from the driveway to the front door of the premises.

---

[1]     Because this affidavit is submitted for the limited purpose of establishing probable cause for a search warrant, I have not set forth each and every fact learned during the course of this investigation.

2

## PROBABLE CAUSE

I. Background

5.    In or about 1998, Keith Raniere and Nancy Salzman co-founded Executive Success Programs, Inc. ("ESP"), a series of workshops designed, according to its promotional literature, to "actualize human potential." In or about 2003, Raniere founded an organization called Nxivm (pronounced NEX-i-um), which served as an umbrella organization for ESP and other Raniere-affiliated entities.

6.    On its official website, Nxivm is described as a "professional business providing educational tools, coaching and trainings to corporations and people from all walks of life," and describes its philosophy as "a new ethical understanding" that allows "humanity to rise to its noble possibility."

7.    Nxivm is headquartered in the city of Albany, New York. Nxivm operates centers all over the Americas including in the United States, Canada, Central America and Mexico. Raniere and many members of Nxivm ("Nxians") live approximately 20 miles outside of Albany, New York, in Clifton Park, New York, near Nxivm's headquarters.

8.    Raniere is referred to as "The Vanguard" by Nxians. Every year in August, Nxians celebrate "Vanguard Week" in honor of Raniere's birthday. Nancy Salzman

3

is referred to as "The Prefect" by Nxians, and her birthday is celebrated in May with the "Festival of Flowers."

9.    The public Nxivm website lists Nancy Salzman as the President of ESP.

10.    Each of the Raniere entities offers expensive courses (many, for example, costing $5,000 for 5 days), promising personal and professional development. Participants are encouraged to keep attending classes and to recruit others into the organization in order to rise within the ranks of Nxivm and to reach certain "goal levels." These levels are marked by different color sashes, which are worn by Nxians, as well as different responsibilities and privileges, including the ability to receive a salary or commissions.

11.    Nxivm maintains features of a multilevel marketing scheme, commonly known as a pyramid scheme, in which members are recruited via a promise of payments or services for enrolling others into the scheme. Raniere formerly ran a multilevel marketing scheme called Consumers Buyline, which was forced to close after a settlement with the New York Attorney General in 1997, approximately one year before ESP was founded.

12.    Based on information obtained during the course of this investigation, since ESP's founding, Raniere has maintained a rotating group of fifteen to twenty women with whom he maintains sexual relationships. These women are not permitted to have sexual relationships with anyone but Raniere or to discuss with others their relationships with Raniere. Some of the Nxivm curriculum included teachings about the need for men to have multiple sexual partners and the need for women to be monogamous.

4





III.   DOS

A. Development and Structure

19.   In or about 2015, Raniere founded a secret society within Nxivm called "DOS" or the "Vow" (collectively "DOS").[2]

---

[2]   According to various sources of information, DOS stands for "Dominus Obsequious Sororium," which at least one DOS slave was told by her master translates to "Master Over the Slave Women." According to a Latin expert I consulted, this phrase is broken Latin ("obsequious" is an English word and the Latin would properly be "obsequiosarum," and "sororium" would properly be "sororum"), but roughly translates to "Lord/Master of the Obedient Female Companions."

6

20.     DOS operates as a pyramid with levels of "slaves" headed by "masters." Slaves are expected to recruit slaves of their own (thus becoming masters themselves), who in turn owe service not only to their own masters but also to masters above them in the DOS pyramid.

21.     Based on information gathered over the course of this investigation, including Raniere's own admissions, and emails between Raniere and other members of DOS, Raniere alone forms the top of the pyramid as the highest master. Other than Raniere, all participants in DOS are women. Raniere's status as head of the pyramid was concealed from all newly recruited slaves, other than those directly under Raniere.

22.     From the time of its inception through in or about Spring 2017, DOS masters recruited slaves mostly from within Nxivm's ranks. When identifying prospective slaves, masters often targeted women who were currently experiencing difficulties in their lives, including dissatisfaction with the pace of their advancement in Nxivm. While avoiding the words "master" and "slave" in the initial recruiting pitch, a master would tell her prospective slave that the prospective slave had an opportunity to join an organization that would change her life. The master then told the prospective slave that, in order to learn more, she had to provide "collateral," which was meant to ensure that the prospective slave would keep what she was about to learn a secret. Collateral consisted of material or information that the prospective slave would not want revealed because it would be ruinous to the prospective slave herself and/or someone close to her.

23.     Collateral provided by prospective slaves included sexually explicit photographs; videos made to look candid in which the prospective slaves told damning

stories (true or untrue) about themselves, close friends and/or family members; and letters making damaging accusations (true or untrue) against friends and family members and assigning the rights to certain assets. In many cases, the masters helped the prospective slaves develop ideas for what would be appropriate collateral or instructed the prospective slaves on lies to tell in order to make the collateral even more damaging.

24.     After prospective slaves provided collateral in order to learn more about the organization, the masters informed them that DOS was a women-only organization (Raniere's role as the highest master was not mentioned) and that the goal of DOS was to eradicate weaknesses in its members.

25.     All DOS slaves were ultimately required to provide collateral beyond what had initially been described to them. For example, most DOS slaves were not initially told that they would have to provide collateral every month. In most cases the DOS slaves continued to provide additional collateral beyond what they had initially understood was expected, in part because they feared that the collateral they had already provided would be released.

26.     DOS slaves provided collateral to their masters in multiple forms including uploading collateral to an online storage account and providing collateral on thumb drives. Lauren Salzman, who is a DOS master, told one of her slaves that the collateral is kept in a safe.

27.     DOS slaves were required to perform "acts of care" for their masters and to pay "tribute" to their masters in various ways. In many cases these acts of care and tribute were akin to acting as personal assistants to the masters – bringing them coffee,

8

buying them groceries, making them lunch, carrying their luggage, cleaning their houses and retrieving lost items for them, among other tasks. The understanding among DOS members was that acts of care provided by a master's slaves, and those slaves' own slaves, should ultimately amount to the master having the work of at least one full time employee.

28.     Slaves were chastised and punished for not performing sufficient acts of care, and slaves believed that if they repeatedly failed at acts of care they risked release of their collateral.

29.     Many DOS slaves were also branded with a cauterizing pen during a process that took 20-30 minutes. The branding "ceremony" involved slaves taking turns holding each other down while the branding was filmed. DOS masters informed the DOS slaves that the video footage of the slaves being branded and naked pictures of the women bearing their brands were further pieces of collateral.

B. Sex Trafficking Within DOS

30.     Beyond acts of care, DOS slaves were also regularly given assignments to complete by their masters. Some of the masters gave their slaves assignments that either directly or implicitly required them to have sex with Raniere, which they then did. Other assignments appeared designed to groom slaves sexually for Raniere. For example, Raniere is known to sexually prefer women who are exceptionally thin, and a number of the slaves' assignments required them to adhere to extremely low-calorie diets and to document every food they ate. Other women were assigned to periods of celibacy, during which they were not allowed to have sex with anyone or masturbate.

9

31.     Based on information obtained over the course of the investigation, DOS victims who received the assignment to have sex with Raniere believed they had to complete the assignment or risk release of their collateral.

32.     The DOS masters, who directed their slaves to have sex with Raniere, profited from the resulting sex acts.  Those DOS masters received a financial benefit in the form of continued status and participation in DOS, i.e. the masters continued to receive acts of care and the work of the equivalent of a full-time employee.  In addition, by requiring DOS slaves to have sex with Raniere, DOS masters also received benefits from Raniere in the form of increased status and financial opportunities within Nxivm more broadly.  Raniere also often discussed or promised career opportunities to the DOS slaves who had sex with him and the DOS slaves with whom he expressed an interest in having sex.  As one example, discussed further below, once Jane Doe 1 began having sex with Raniere, he provided her with money and offered her a job, but as soon as she defected from DOS and stopped having sex with him, Raniere told her she had to pay the money back.

C.  Defections and Aftermath

33.     In or about May 2017, a DOS slave (who was also a high-ranking member of Nxivm) defected in a public way.  At that time, Nxians began learning about the existence of DOS and there was some defection of Nxians, including a member of the Executive Board and additional DOS members.

34.     In or about October 2017, the New York Times published an article revealing the existence of DOS.  Several weeks after that article was published and after the FBI began interviewing witnesses, Raniere flew to Mexico with an heiress (the "Heiress"),

10

who is a member of Nxivm's Executive Board and is a known financial backer of Raniere and Nxivm. Prior to this trip, Raniere had not flown out of the country since 2015, when he visited the Heiress's private island in Fiji. On March 25, 2018. after a month and a half of searching, the defendant was located staying in a luxury villa in Puerto Vallarta, Mexico. The defendant had stopped using the cellular telephone known to law enforcement and began using end-to-end encrypted email, which made finding him difficult. The defendant was deported by Mexican authorities and arrested by the FBI today in Dallas, Texas on a complaint charging him with sex trafficking, sex trafficking conspiracy and forced labor conspiracy. A copy of the complaint is attached as Exhibit 1 and incorporated herein by reference.

35.   Since defecting, several DOS victims have received "cease and desist" letters from a Mexican attorney. Emails exchanged between Raniere and the Heiress, received pursuant to a search warrant executed on Raniere's email account, reveal that the Heiress and Raniere orchestrated the sending of those letters. Additionally, the Heiress has made multiple attempts to have criminal charges brought against a former DOS slave, who has discussed her experience in the media.

36.   In or about December 2017, a letter purporting to be from Raniere was posted on Nxivm's website. In the letter Raniere stated that neither he nor Nxivm are affiliated with DOS. Nxivm has continued to enroll students in courses since Raniere left for Mexico, though enrollment numbers have been down since the media reports of DOS.

11



12



13



14





## **TECHNICAL TERMS**

47.     Based on my training and experience, I use the following technical

terms to convey the following meanings:

a.      IP Address:  The IP address is a unique numeric address used

by computers on the internet.  An IP address looks like a series of four numbers, each in the

range 0-255, separated by periods (e.g., 121.56.97.178).  Every computer attached to the

internet must be assigned an IP address so that internet traffic sent from and directed to that

computer may be directed properly from its source to its destination.  Most internet service

16

providers control a range of IP addresses.  Some computers have static—that is, long-term—IP addresses, while other computers have dynamic—that is, frequently changed—IP addresses.

      b.    Internet: The internet is a global network of computers and other electronic devices that communicate with each other.  Due to the structure of the internet, connections between devices on the internet often cross state and international borders, even when the devices communicating with each other are in the same state.

      c.    Storage medium: A storage medium is any physical object upon which computer data can be recorded.  Examples include hard disks, RAM, floppy disks, flash memory, CD-ROMs, and other magnetic or optical media.

## COMPUTERS, ELECTRONIC STORAGE, AND FORENSIC ANALYSIS

48.    As described above and in Attachment B, this application seeks permission to search for records that might be found on the SUBJECT PREMISES, in whatever form they are found.  One form in which the records might be found is data stored on a computer's hard drive or other storage medium.  Thus, the warrant applied for would authorize the seizure of electronic storage medium or, potentially, the copying of electronically stored information, all under Rule 41(e)(2)(B).

49.    *Probable cause.*  I submit that if a computer or storage medium is found on the SUBJECT PREMISES, there is probable cause to believe those records will be stored on that computer or storage medium, for at least the following reasons:

      a.    Based on my knowledge, training, and experience, I know that computer files or remnants of such files can be recovered months or even years after they

17

have been downloaded onto a storage medium, deleted, or viewed via the internet.

Electronic files downloaded to a storage medium can be stored for years at little or no cost.

Even when files have been deleted, they can be recovered months or years later using

forensic tools. This is so because when a person "deletes" a file on a computer, the data

contained in the file does not actually disappear; rather, that data remains on the storage

medium until it is overwritten by new data.

   b. Therefore, deleted files, or remnants of deleted files, may reside in free

space or slack space—that is, in space on the storage medium that is not currently being used

by an active file—for long periods of time before they are overwritten. In addition, a

computer's operating system may also keep a record of deleted data in a "swap" or

"recovery" file.

   c. Wholly apart from user-generated files, computer storage media—in

particular, computers' internal hard drives—contain electronic evidence of how a computer

has been used, what it has been used for, and who has used it. To give a few examples, this

forensic evidence can take the form of operating system configurations, artifacts from

operating system or application operation, file system data structures, and virtual memory

"swap" or paging files. Computer users typically do not erase or delete this evidence,

because special software is typically required for that task. However, it is technically

possible to delete this information.

   d. Similarly, files that have been viewed via the internet are sometimes

automatically downloaded into a temporary internet directory or "cache."

50.     Forensic evidence.  As further described in Attachment B, this application seeks permission to locate not only computer files that might serve as direct evidence of the crimes described on the warrant, but also for forensic electronic evidence that establishes how computers were used, the purpose of their use, who used them, and when. There is probable cause to believe that this forensic electronic evidence will be on any storage medium in the SUBJECT PREMISES because:

a.      Data on the storage medium can provide evidence of a file that was once on the storage medium but has since been deleted or edited, or of a deleted portion of a file (such as a paragraph that has been deleted from a word processing file).  Virtual memory paging systems can leave traces of information on the storage medium that show what tasks and processes were recently active.  Web browsers, e-mail programs, and chat programs store configuration information on the storage medium that can reveal information such as online nicknames and passwords.  Operating systems can record additional information, such as the attachment of peripherals, the attachment of USB flash storage devices or other external storage media, and the times the computer was in use.  Computer file systems can record information about the dates files were created and the sequence in which they were created, although this information can later be falsified.

b.      As explained herein, information stored within a computer and other electronic storage media may provide crucial evidence of the "who, what, why, when, where, and how" of the criminal conduct under investigation, thus enabling the United States to establish and prove each element or alternatively, to exclude the innocent from further suspicion.  In my training and experience, information stored within a computer or storage

19

media (e.g., registry information, communications, images and movies, transactional information, records of session times and durations, internet history, and anti-virus, spyware, and malware detection programs) can indicate who has used or controlled the computer or storage media. This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence. The existence or absence of anti-virus, spyware, and malware detection programs may indicate whether the computer was remotely accessed, thus inculpating or exculpating the computer owner. Further, computer and storage media activity can indicate how and when the computer or storage media was accessed or used. For example, as described herein, computers typically contain information that log: computer user account session times and durations, computer activity associated with user accounts, electronic storage media that connected with the computer, and the IP addresses through which the computer accessed networks and the internet. Such information allows investigators to understand the chronological context of computer or electronic storage media access, use, and events relating to the crime under investigation. Additionally, some information stored within a computer or electronic storage media may provide crucial evidence relating to the physical location of other evidence and the suspect. For example, images stored on a computer may both show a particular location and have geolocation information incorporated into its file data. Such file data typically also contains information indicating when the file or image was created. The existence of such image files, along with external device connection logs, may also indicate the presence of additional electronic storage media (e.g., a digital camera or cellular phone with an incorporated camera). The geographic and timeline information described herein may either inculpate or exculpate the

20

computer user.  Last, information stored within a computer may provide relevant insight into the computer user's state of mind as it relates to the offense under investigation.  For example, information within the computer may indicate the owner's motive and intent to commit a crime (e.g., internet searches indicating criminal planning), or consciousness of guilt (e.g., running a "wiping" program to destroy evidence on the computer or password protecting/encrypting such evidence in an effort to conceal it from law enforcement).

  c.  A person with appropriate familiarity with how a computer works can, after examining this forensic evidence in its proper context, draw conclusions about how computers were used, the purpose of their use, who used them, and when.

  d.  The process of identifying the exact files, blocks, registry entries, logs, or other forms of forensic evidence on a storage medium that are necessary to draw an accurate conclusion is a dynamic process.  While it is possible to specify in advance the records to be sought, computer evidence is not always data that can be merely reviewed by a review team and passed along to investigators.  Whether data stored on a computer is evidence may depend on other information stored on the computer and the application of knowledge about how a computer behaves.  Therefore, contextual information necessary to understand other evidence also falls within the scope of the warrant.

  e.  Further, in finding evidence of how a computer was used, the purpose of its use, who used it, and when, sometimes it is necessary to establish that a particular thing is not present on a storage medium.  For example, the presence or absence of counter-forensic programs or anti-virus programs (and associated data) may be relevant to establishing the user's intent.

f.      I know that when an individual uses a computer to obtain or exploit personal information over the internet, the individual's computer will generally serve both as an instrumentality for committing the crime, and also as a storage medium for evidence of the crime.  The computer is an instrumentality of the crime because it is used as a means of committing the criminal offense.  The computer is also likely to be a storage medium for evidence of crime.  From my training and experience, I believe that a computer used to commit a crime of this type may contain: data that is evidence of how the computer was used; data that was sent or received; notes as to how the criminal conduct was achieved; records of internet discussions about the crime; and other records that indicate the nature of the offense.

51.     Necessity of seizing or copying entire computers or storage media.  In most cases, a thorough search of a premises for information that might be stored on storage media often requires the seizure of the physical storage media and later off-site review consistent with the warrant.  In lieu of removing storage media from the premises, it is sometimes possible to make an image copy of storage media.  Generally speaking, imaging is the taking of a complete electronic picture of the computer's data, including all hidden sectors and deleted files.  Either seizure or imaging is often necessary to ensure the accuracy and completeness of data recorded on the storage media, and to prevent the loss of the data either from accidental or intentional destruction.  This is true because of the following:

a.      The time required for an examination.  As noted above, not all evidence takes the form of documents and files that can be easily viewed on site.  Analyzing evidence of how a computer has been used, what it has been used for, and who has used it

22

requires considerable time, and taking that much time on premises could be unreasonable. As explained above, because the warrant calls for forensic electronic evidence, it is exceedingly likely that it will be necessary to thoroughly examine storage media to obtain evidence. Storage media can store a large volume of information. Reviewing that information for things described in the warrant can take weeks or months, depending on the volume of data stored, and would be impractical and invasive to attempt on-site.

b.      Technical requirements. Computers can be configured in several different ways, featuring a variety of different operating systems, application software, and configurations. Therefore, searching them sometimes requires tools or knowledge that might not be present on the search site. The vast array of computer hardware and software available makes it difficult to know before a search what tools or knowledge will be required to analyze the system and its data on the Premises. However, taking the storage media off-site and reviewing it in a controlled environment will allow its examination with the proper tools and knowledge.

c.      Variety of forms of electronic media. Records sought under this warrant could be stored in a variety of storage media formats that may require off-site reviewing with specialized forensic tools.

52.      Nature of examination. Based on the foregoing, and consistent with Rule 41(e)(2)(B), the warrant I am applying for would permit seizing, imaging, or otherwise copying storage media that reasonably appear to contain some or all of the evidence described in the warrant, and would authorize a later review of the media or information consistent with the warrant. The later review may require techniques, including but not

limited to computer-assisted scans of the entire medium, that might expose many parts of a hard drive to human inspection in order to determine whether it is evidence described by the warrant.

## CONCLUSION

53.     Based on the forgoing, I respectfully submit that there is probable cause to believe that a search of the SUBJECT PREMISES, further described in Attachment A, will lead to the discovery of the things described in Attachment B, all of which constitute evidence, fruits and instrumentalities of the Subject Offenses, and request that a search warrant be issued for THE PREMISES KNOWN AND DESCRIBED AS 3 OREGON TRAIL, WATERFORD, NY 12188 (the "SUBJECT PREMISES") INCLUDING ANY LOCKED AND CLOSED CONTAINERS AND CLOSED ITEMS CONTAINED THEREIN.

54..    I further respectfully request that the Court issue an order sealing, until further order of the Court, all papers submitted in support of this application, including the application and search warrant.  I believe that sealing these documents is necessary because the items and information to be seized are relevant to an ongoing criminal investigation, and that the targets of this investigation are not aware of its existence or its nature and scope. Based on my training and experience, I have learned that criminals actively search for criminal affidavits and search warrants via the internet, and disseminate them to other criminals as they deem appropriate, e.g., by posting them publicly through online forums. Premature disclosure of the contents of this affidavit and related documents may have a

significant and negative impact on the continuing investigation and may severely jeopardize its effectiveness, lead to the destruction of evidence, or cause criminals to change patterns of behavior.

MICHAEL LEVER
Special Agent
Federal Bureau of Investigation

Sworn to before me this
26th day of March, 2018

THE HONORABLE DANIEL J. STEWART
UNITED STATES MAGISTRATE JUDGE
NORTHERN DISTRICT OF NEW YORK

25

## ATTACHMENT A
### Property to Be Searched

The premises to be searched is known and described as 3 OREGON TRAIL, WATERFORD, NY 12188 (the "SUBJECT PREMISES") INCLUDING ANY LOCKED AND CLOSED CONTAINERS AND CLOSED ITEMS CONTAINED THEREIN, is a two-story residential property, color brown. The residence is accessible via a driveway which leads to a single garage. There is a walkway which leads from the driveway to the front door of the premises. Two photographs of the SUBJECT PREMISES which were taken in approximately September 2011 are illustrated below.





## ATTACHMENT B
Particular Things to be Seized

Things to be seized from the SUBJECT PREMISES, all of which constitute evidence, fruits and instrumentalities of violations of 18 U.S.C. § 1591 (sex trafficking by force, fraud or coercion and interference in an investigation into sex trafficking by force, fraud or coercion), 18 U.S.C. § 1589 (forced labor), ███████████

██████████████████████████████████████

(collectively, the "Subject Offenses") involving KEITH RANIERE, ███████
██████████████████ occurring in or after January 1, 2015, include:

a. Records, things and other information that constitute evidence, fruits and instrumentalities of the Subject Offenses, including but not limited to, "collateral," as described in the affidavit; sex trafficking paraphernalia; evidence regarding the formation and structure of DOS; notes or writings related to DOS; communications between RANIERE and any DOS masters/slaves; evidence showing an attempt to dissociate RANIERE and/or Nxivm from DOS; and evidence of RANIERE's flight from prosecution;

b. Computers or storage media used as a means to commit or facilitate the commission of the Subject Offenses (including to store "collateral," as described in the affidavit); and

c. Bundles of United States currency evidencing the existence of schemes to commit the Subject Offenses or proceeds of the Subject Offenses.

For any computer or storage medium whose seizure is otherwise authorized by this warrant, and any computer or storage medium that contains or in which is stored records or information that is otherwise called for by this warrant (hereinafter, "COMPUTER"):

a. Evidence of who used, owned, or controlled the COMPUTER at the time the things described in this warrant were created, edited, or deleted, such as logs, registry entries, configuration files, saved usernames and passwords, documents, browsing history, user profiles, email, email contacts, "chat," instant messaging logs, photographs, and correspondence;

b. Evidence of software that would allow others to control the COMPUTER, such as viruses, Trojan horses, and other forms of malicious software, as well as evidence of the presence or absence of security software designed to detect malicious software;

c. Evidence of the lack of such malicious software;

d. Evidence indicating how and when the computer was accessed or used to determine the chronological context of computer access, use, and events relating to crime under investigation and to the computer user;

e.    Evidence indicating the computer user's state of mind as it relates to the Subject Offenses;

f.    Evidence of the attachment to the COMPUTER of other storage devices or similar containers for electronic evidence;

g.    Evidence of counter-forensic programs (and associated data) that are designed to eliminate data from the COMPUTER;

h.    Evidence of the times the COMPUTER was used;

i.    Passwords, encryption keys, and other access devices that may be necessary to access the COMPUTER;

j.    Documentation and manuals that may be necessary to access the COMPUTER or to conduct a forensic examination of the COMPUTER;

k.    Records of or information about Internet Protocol addresses used by the COMPUTER;

l.    Records of or information about the COMPUTER's internet activity, including firewall logs, caches, browser history and cookies, "bookmarked" or "favorite" web pages, search terms that the user entered into any Internet search engine, and records of user-typed web addresses;

m.    Contextual information necessary to understand the evidence described in this attachment; and

n.    Routers, modems, and network equipment used to connect computers to the Internet.

As used above, the terms "records" and "information" includes all forms of creation or storage, including any form of computer or electronic storage (such as hard disks or other media that can store data); any handmade form (such as writing); any mechanical form (such as printing or typing); and any photographic form (such as microfilm, microfiche, prints, slides, negatives, videotapes, motion pictures, or photocopies).

The term "computer" includes all types of electronic, magnetic, optical, electrochemical, or other high speed data processing devices performing logical, arithmetic, or storage functions, including desktop computers, notebook computers, mobile phones, tablets, server computers, and network hardware.

The term "storage medium" includes any physical object upon which computer data can be recorded. Examples include hard disks, RAM, floppy disks, flash memory, CD-ROMs, and other magnetic or optical media.

(Exhibit – Complaint and Affidavit in Support of Arrest Warrant, dated 2/14/18)

AL:MKP/TH
F. #2017R00588

18M132

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - X

UNITED STATES OF AMERICA

     - against -

KEITH RANIERE, also known as
"The Vanguard,"

          Defendant.

- - - - - - - - - - - - - - - - - - - - - - - - - - X

TO BE FILED UNDER SEAL

COMPLAINT
AND AFFIDAVIT IN
SUPPORT OF ARREST
WARRANT

(18 U.S.C. §§ 1589(a)(2), 1589(a)(4),
1591(a)(1), 1594 (b), 1594(c), 2 and 3551
et seq.)

EASTERN DISTRICT OF NEW YORK, SS:

     MICHAEL LEVER, being duly sworn, deposes and states that he is a Special

Agent with the Federal Bureau of Investigation, duly appointed according to law and acting

as such.

     In or about and between February 2016 and June 2017, both dates being

approximate and inclusive, within the Eastern District of New York and elsewhere, the

defendant KEITH RANIERE, together with others, did knowingly and intentionally conspire

to recruit, entice, harbor, transport, provide, obtain, maintain, patronize and solicit persons, to

wit: Jane Does 1 and 2, individuals whose identities are known to the undersigned, in and

affecting interstate and foreign commerce, knowing that means of force, threats of force,

fraud and coercion, as described in Title 18, United States Code, Section 1591(e)(2), and one

or more combinations of such means, would be used to cause such persons to engage in

one or more commercial sex acts, contrary to Title 18, United States Code, Section 1591(a)(1).

(Title 18, United States Code, Sections 1594(c), 1591(b)(1) and 3551 et seq.)

In or about and between February 2016 and June 2017, both dates being approximate and inclusive, within the Eastern District of New York and elsewhere, the defendant KEITH RANIERE, together with others, did knowingly and intentionally recruit, entice, harbor, transport, provide, obtain, maintain, patronize and solicit persons, to wit: Jane Does 1 and 2, individuals whose identities are known to the undersigned, in and affecting interstate and foreign commerce, knowing that means of force, threats of force, fraud and coercion, as described in Title 18, United States Code, Section 1591(e)(2), and one or more combinations of such means, would be used to cause such persons to engage in one or more commercial sex acts.

(Title 18, United States Code, Sections 1591(a)(1), 1591(b)(1), 2 and 3551 et seq.)

In or about and between February 2016 and June 2017, both dates being approximate and inclusive, within the Eastern District of New York and elsewhere, the defendant KEITH RANIERE, together with others, did knowingly and intentionally conspire to provide and obtain the labor and services of a person, to wit: Jane Doe 1, by threats of serious harm to her and one or more other persons, and by means of one or more schemes, plans and patterns intended to cause Jane Doe 1 to believe that, if she did not perform such

labor and services, Jane Doe 1 and one or more other persons would suffer serious harm, contrary to Title 18, United States Code, Sections 1589(a)(2) and 1589(a)(4).

(Title 18, United States Code, Sections 1594(b) and 3551 et seq.)

The source of your deponent's information and the grounds for his belief are as follows:

1.     I am a Special Agent with the Federal Bureau of Investigation ("FBI") and have been involved in the investigation of cases involving sex trafficking and civil rights violations.

2.     I have personally participated in the investigation of the offenses discussed below.   The information set forth in this Complaint and Affidavit in Support of Arrest Warrant is derived from my participation in the investigation as well as from, among other things, a review of other records, emails, and reports from other law enforcement agents involved in the investigation.   In particular, the FBI has interviewed eight victims and many additional first-hand witnesses to the events described herein, electronic evidence recovered from the victims and witnesses, and the results of several search warrants including one executed on an email account belonging to RANIERE.   Because this affidavit is submitted only to establish probable cause to arrest, I have not included each and every fact known to me concerning this investigation.   I have set forth only the facts I believe are necessary to establish probable cause.   In addition, when I refer below to the statements of others, such references are in sum and substance and in part.

I.     Background

3.     In or about 1998, the defendant KEITH RANIERE, also known as "The Vanguard," founded Executive Success Programs, Inc. ("ESP"), a series of workshops

designed, according to its promotional literature, to "actualize human potential."   In or about

2003, RANIERE founded an organization called Nxivm (pronounced NEX-i-um), which

served as an umbrella organization for ESP and other RANIERE-affiliated entities.

       4.     On its official website, Nxivm is described as a "professional business

providing educational tools, coaching and trainings to corporations and people from all walks

of life," and describes its philosophy as "a new ethical understanding" that allows "humanity

to rise to its noble possibility."

       5.     Nxivm is headquartered in Albany, New York.   Nxivm operates

centers all over the Americas including in the United States, Canada, Central America and

Mexico.   RANIERE and many members of Nxivm ("Nxians") live approximately 20 miles

outside of Albany, New York, in Clifton Park, New York, near Nxivm's headquarters.   A

number of Nxians were residents of the Eastern District of New York, when they were

recruited, and Nxivm has held promotional recruiting events in Brooklyn, New York.

       6.     Each of the RANIERE entities offers classes promising personal and

professional development.   Based on information obtained during the course of this

investigation, classes offered by RANIERE-affiliated entities can cost up to $5,000 for a

five-day workshop.   Participants are encouraged to keep attending classes and to recruit

others into the organization in order to rise within the ranks of Nxivm and to reach certain

"goal levels."   These levels are marked by different color sashes, which are worn by Nxians,

as well as different responsibilities and privileges, including the ability to receive a salary or

commissions.   Many Nxians find themselves in debt from the courses they are required to

take, and some are obliged to take jobs working for Nxivm in order to continue taking

courses and ostensibly to pay off their debts.   However, because of the high price of the

courses and the pressure to continue taking them, participants often would continue to accumulate new debts and remain obliged to Nxivm.

7.      Nxivm operates largely in secrecy.   Nxians were often required to sign non-disclosure agreements and to make promises not to reveal certain things about Nxivm's teachings.

8.      Nxivm maintains features of a multilevel marketing scheme, commonly known as a pyramid scheme, in which members are recruited via a promise of payments or services for enrolling others into the scheme.   RANIERE formerly ran a multilevel marketing scheme called Consumers Buyline, which was forced to close after a settlement with the New York Attorney General in 1997, approximately one year before ESP was founded.

9.      RANIERE is referred to as "The Vanguard" by Nxians.   Every year in August, Nxians pay $2,000 or more to gather in Silver Bay, New York to celebrate "Vanguard Week" in honor of RANIERE, whose birthday is August 26, 1960.

10.     Based on information obtained during the course of this investigation, since ESP's founding, RANIERE has maintained a rotating group of fifteen to twenty women with whom he maintains sexual relationships.   These women are not permitted to have sexual relationships with anyone but RANIERE or to discuss with others their relationships with RANIERE.   Some of the Nxivm curriculum included teachings about the need for men to have multiple sexual partners and the need for women to be monogamous.

II.     DOS

A. Founding and Structure

11.     In or about 2015, a secret society was developed within Nxivm called "DOS" or the "Vow" (collectively "DOS").[1]

12.     DOS is an organized criminal group that operates in the Eastern District of New York and other parts of the United States, Canada and Mexico. DOS engages in, and its activities affect, interstate and foreign commerce.

13.     DOS operates as a pyramid with levels of "slaves" headed by "masters." Slaves are expected to recruit slaves of their own (thus becoming masters themselves), who in turn owe service not only to their own masters but also to masters above them in the DOS pyramid.

14.     Based on information gathered over the course of this investigation, including RANIERE's own admissions and emails between RANIERE and other members of DOS, RANIERE alone forms the top of the pyramid as the highest master. Other than RANIERE, all participants in DOS are women. RANIERE's status as head of the pyramid was concealed from all newly recruited slaves, other than those directly under RANIERE.

B. Recruiting and Collateral

15.     From the time of its inception through in or about Spring 2017, DOS masters recruited slaves mostly from within Nxivm's ranks. When identifying prospective

---

[1]     According to various sources of information, DOS stands for "Dominus Obsequious Sororium," which at least one DOS slave was told by her master translates to "Master Over the Slave Women." According to a Latin expert I consulted, this phrase is broken Latin ("obsequious" is an English word and the Latin would properly be "obsequiosarum," and "sororium" would properly be "sororum"), but roughly translates to "Lord/Master of the Obedient Female Companions".

slaves, masters often targeted women who were currently experiencing difficulties in their lives, including dissatisfaction with the pace of their advancement in Nxivm.   While avoiding the words "master" and "slave" in the initial recruiting pitch, a master would tell her prospective slave that the prospective slave had an opportunity to join an organization that would change her life.   The master then told the prospective slave that, in order to learn more, she had to provide "collateral," which was meant to ensure that the prospective slave would keep what she was about to learn a secret.   Collateral consisted of material or information that the prospective slave would not want revealed because it would be ruinous to the prospective slave herself and/or someone close to her.

16.   Collateral provided by prospective slaves included sexually explicit photographs; videos made to look candid in which the prospective slaves told damning stories (true or untrue) about themselves, close friends and/or family members; and letters making damaging accusations (true or untrue) against friends and family members.   In many cases, the masters helped the prospective slaves develop ideas for what would be appropriate collateral or instructed the prospective slaves on lies to tell in order to make the collateral even more damaging.

17.   After prospective slaves provided collateral in order to learn more about the organization, the masters informed them that DOS was a women-only organization (RANIERE's role as the highest master was not mentioned) and that the goal of DOS was to eradicate weaknesses in its members.   The Nxivm curriculum taught that women had inherent weaknesses including "overemotional" natures, an inability to keep promises and embracing the role of victim.   The masters also told prospective slaves that their respective relationships would be of "masters" and "slaves," using those words.   If prospective slaves

expressed hesitation about the program or about becoming "slaves" and having "masters," the masters downplayed the terms, saying that all women are slaves to various things.   In many cases, masters also used Nxivm techniques to manipulate the prospective slaves into believing that any hesitation to join was due to weaknesses on the part of the prospective slaves and that the hesitation itself was evidence of why they needed DOS.

18.     Prospective slaves who agreed to join DOS were told that in order to join they had to provide additional collateral, similar in type to the collateral they had already provided.   Some slaves were told that they had to collateralize all aspects of their lives, including signing over any assets, disclaiming their faith, and doing things that would ruin their careers and relationships if the collateral were released.   DOS slaves understood that if they left DOS, spoke publicly about DOS, or repeatedly failed DOS obligations or assignments, their collateral could be released.

19.     All DOS slaves were ultimately required to provide collateral beyond what had initially been described to them.   For example, most DOS slaves were not initially told that they would have to provide collateral every month.   In most cases the DOS slaves continued to provide additional collateral beyond what they had initially understood was expected, in part because they feared that the collateral they had already provided would be released.

C.   Benefits Conferred on DOS Masters

20.     DOS slaves were required to perform "acts of care" for their masters and to pay "tribute" to their masters in various ways.   In many cases these acts of care and tribute were akin to acting as personal assistants to the masters – bringing them coffee, buying them groceries, making them lunch, carrying their luggage, cleaning their houses and

retrieving lost items for them, among other tasks.   The understanding among DOS members was that acts of care provided by a master's slaves, and those slaves' own slaves, should ultimately amount to the master having the work of at least one full time employee.

21.     Slaves were chastised and punished for not performing sufficient acts of care, and slaves believed that if they repeatedly failed at acts of care they risked release of their collateral.

D. Sex Trafficking Within DOS

22.     Beyond acts of care, DOS slaves were also regularly given assignments to complete by their masters.   Some of the masters gave their slaves assignments that either directly or implicitly required them to have sex with RANIERE, which they then did. Other assignments appeared designed to groom slaves sexually for RANIERE.   For example, RANIERE is known to sexually prefer women who are exceptionally thin, and a number of the slaves' assignments required them to adhere to extremely low-calorie diets and to document every food they ate.   Other women were assigned to periods of celibacy, during which they were not allowed to have sex with anyone or masturbate.

23.     Based on information obtained over the course of the investigation, DOS victims who received the assignment to have sex with RANIERE believed they had to complete the assignment or risk release of their collateral.

24.     The DOS masters, including Co-Conspirator 1 ("CC-1," described below), who directed their slaves to have sex with RANIERE profited from the resulting sex acts.   Those DOS masters received a financial benefit in the form of continued status and participation in DOS, i.e. the masters continued to receive acts of care and the work of the equivalent of a full time employee.   In addition, by requiring DOS slaves to have sex with

RANIERE, DOS masters also received benefits from RANIERE in the form of increased status and financial opportunities within Nxivm more broadly.   RANIERE also often discussed or promised career opportunities to the DOS slaves who had sex with him and the DOS slaves with whom he expressed an interest in having sex.   As one example, discussed further below, once Jane Doe 1 began having sex with RANIERE, he provided her with money and offered her a job, but as soon as she defected from DOS and stopped having sex with him, RANIERE told her she had to pay the money back.

E.   Other Assignments and "Readiness"

25.   DOS slaves were also regularly given assignments to complete by their masters that included reviewing ESP materials and doing other work for Nxivm or RANIERE.   This work included reviewing and editing dense articles written by RANIERE and, at least in one case described further below, transcribing interviews of a high-ranking member of Nxivm for a memorial service being hosted by RANIERE.

26.   In addition to completing acts of care and assignments, DOS slaves were required to participate in "readiness" drills.   The purpose of these drills was to have everyone in the DOS pyramid respond by text message at any given time of the day or night. Readiness drills along with other aspects of the DOS program resulted in the slaves suffering from severe sleep deprivation.

27.   DOS slaves also had to engage in acts of self-denial or acts that would cause them discomfort, including taking ice cold showers for several minutes, standing for an hour at 4:00 a.m. and performing planks (a difficult exercise where one rests on her forearms and tiptoes and keeps her back as flat as possible).

28.     Based on information obtained over the course of the investigation, DOS victims have explained that they believed they had to complete their assignments and comply with readiness drills and acts of self-denial or risk release of their collateral. Additionally, several DOS victims believed that their success in the Nxivm ranking system depended on their successfully completing DOS assignments.

29.     Furthermore, masters informed their slaves that if the slaves failed to complete their assignments, it reflected badly on the masters and could cause them to be punished by their own masters.   In at least one instance, a master who, unbeknownst to her slaves, was herself a direct slave of RANIERE's, told her slaves that she could be punished by being paddled or by being put in a cage by her master, i.e. by RANIERE, for her slaves' failure to succeed at "readiness."

F.   Branding

30.     Many of the DOS victims were branded in their pubic regions with a cauterizing pen in a process that took twenty to thirty minutes.   During the branding "ceremonies," slaves were required to be fully naked, and the master would order one slave to film while the others held down the slave being branded.   Some DOS victims were told that the brand stood for the four elements (the lines represented air, earth and water and the cauterizing pen represented sealing with fire).   Based on information obtained during the course of the investigation, however, it is clear that the brand in fact consisted of RANIERE's initials.   After defections, discussed below in paragraph 33, RANIERE acknowledged to one DOS victim that his initials are incorporated into the brand as a form of "tribute."

31.     Masters told their slaves after the branding ceremonies that the videos of the branding ceremonies and photographs of the women with their brands were additional pieces of collateral.

32.     The first image below is a picture of victim Jane Doe 1's brand as it appeared on her body shortly after the procedure.   The second image shows the brand turned counter-clockwise with RANIERE's initials (the "R" upside down) superimposed.



III.     Defections and Aftermath

33.     In or about May 2017, a DOS slave (who was also a high-ranking member of Nxivm) defected in a public way.   At that time, Nxians began learning about the existence of DOS and there was some defection of Nxians, including a member of the Executive Board and additional DOS members.

34.     In or about October 2017, the New York Times published an article revealing the existence of DOS.   Several weeks after that article was published and after the

FBI began interviewing witnesses, RANIERE flew to Mexico with an heiress (the "Heiress"), who is a member of Nxivm's Executive Board and is a known financial backer of RANIERE and Nxivm.   Prior to this trip, RANIERE had not flown out of the country since 2015, when he visited the Heiress's private island in Fiji.   RANIERE is currently believed to be residing in Monterrey, Mexico, where Nxivm maintains a center, with a branded DOS slave.

35.     Since defecting, several DOS victims have received "cease and desist" letters from a Mexican attorney.   Emails exchanged between RANIERE and the Heiress, received pursuant to a search warrant executed on RANIERE's email account, discussed below, reveal that the Heiress and RANIERE orchestrated the sending of those letters. Additionally, the Heiress has made multiple attempts to have criminal charges brought against a former DOS slave, who has discussed her experience in the media.

IV.    Yahoo! Email Account

36.     On January 18, 2018, Eastern District of New York United States Magistrate Judge Cheryl Pollak signed a search warrant for Yahoo! e-mail account keithraniere@yahoo.com (the "account").   I served the warrant on Yahoo! on January 19, 2018.   On February 1, 2018, Yahoo! produced information associated with the account.   The subscriber for the account was identified as "Mr Keith Raniere."   The subscriber information also included a date of birth that matched that of RANIERE.

37.     Within the material provided by Yahoo! were numerous emails, only a few of which are described here, which support the conclusion that RANIERE created DOS. On August 10, 2015, CC-1 sent an email to the account.   CC-1's email was titled "vow 3" and included an attached letter.   The letter pledged CC-1's "full and complete life" to

RANIERE.  In the letter, CC-1 used the terms "slave" and "master" to refer to herself and RANIERE.  Moreover, the letter identified "collateral" to "cement" the vow made by CC-1.  This collateral was described as: (1) a letter regarding CC-1's mother and father that would "destroy their character"; (2) a contract that transferred custody of any children birthed by CC-1 to RANIERE if CC-1 broke her commitment to RANIERE; (3) a contract that transferred ownership of CC-1's home if the commitment to RANIERE was broken; and (4) a letter addressed to social services alleging abuse to CC-1's nephews.

38.    On July 12, 2015, another woman believed to be a DOS master directly under RANIERE, sent an email to another email account believed to belong to RANIERE, which RANIERE then forwarded to the account.   In the email, the woman requested edits from RANIERE to a series of passages in which she described a vow of total obedience to RANIERE.

39.    The account also contained emails between another woman believed to be a DOS slave and RANIERE.   Attached to some of the emails were WhatsApp chats between the woman and RANIERE.   These chats include discussions from as early as in or about May 2015 about a "vow" that required "collateral."   On or about, October 1, 2015, RANIERE stated to the woman, "I think it would be good for you to own a fuck toy slave for me, that you could groom, and use as a tool, to pleasure me . . . ."   On or about, October 23, 2015, RANIERE again suggested the woman recruit a slave who would seduce RANIERE.   Throughout the chat RANIERE alludes to the fact that DOS was his creation.

V.    Co-Conspirators

40.    CC-1 is an actress and is currently understood to be one of the women with whom RANIERE maintained a sexual relationship prior to the development of DOS.

Statements on Nxivm-related websites, including video interviews of RANIERE and CC-1, refer to RANIERE's mentorship of CC-1, and to RANIERE's and CC-1's co-development of "The Source," a Nxivm-affiliated entity focused on improving actors' performance skills. Based on information obtained over the course of the investigation, including admissions by RANIERE and emails between RANIERE and CC-1, CC-1 is RANIERE's direct slave.

41.    Co-Conspirator 2 ("CC-2") had been involved in Nxivm for several years before being introduced to DOS.   In or about 2016, RANIERE co-founded "The Delegates" with CC-2, which is a business that provides a network of people who can perform tasks for people in the Nxivm community in exchange for a fee.   Based on information obtained over the course of the investigation, CC-2 is CC-1's direct slave.

VI.    Sex Trafficking and Forced Labor of Jane Doe 1

42.    Jane Doe 1 is an actress in her early thirties who began taking Nxivm classes in or about 2015, including The Source classes with CC-1.   In or about February 2016, CC-1 invited Jane Doe 1 to join a "women's mentorship group," but asked that Jane Doe 1 first provide collateral.   At CC-1's direction, Jane Doe 1 wrote letters detailing false and highly damaging accusations against her family members.   Once Jane Doe 1 had provided this collateral, CC-1 told her about DOS, referring to it as "The Vow."

43.    Jane Doe 1 agreed to become CC-1's slave, provided more collateral (eventually including her credit card numbers with letters granting CC-1 permission to use the numbers to make charges) and began receiving assignments.   Throughout her time in DOS, Jane Doe 1 was living in Brooklyn, New York.   CC-1 ordered Jane Doe 1 to travel to Clifton Park nearly every week from Brooklyn.   When Jane Doe 1 was in Clifton Park, she stayed with CC-1 and CC-2, another of CC-1's slaves.

44.     CC-1 told Jane Doe 1 that Jane Doe 1 had to be celibate for six months. Eventually, Jane Doe 1 began receiving assignments that involved contact with RANIERE. At first CC-1 tasked Jane Doe 1 with getting RANIERE to send Jane Doe 1 an email, which she eventually succeeded at doing.   One night when Jane Doe 1 was staying with CC-1 in Clifton Park, CC-1 received a text message from RANIERE, woke Jane Doe 1 in the middle of the night, and told her that RANIERE was there to go on a walk with her.   CC-1 told Jane Doe 1 that Jane Doe 1 was assigned to tell RANIERE that Jane Doe 1 would do anything RANIERE asked her to do.   Jane Doe 1 did as she was ordered and RANIERE asked her what the worst thing he could order her to do was.   Jane Doe 1 told RANIERE that she had initially thought it would be something sexual, but that the worst thing would be if he asked her to kill herself or someone else.   At the end of the walk, RANIERE told Jane Doe 1 that he did not believe she really meant she would do anything he asked.

45.     The next night CC-1 again received a text message from RANIERE, woke Jane Doe 1 in the middle of the night and assigned her to meet RANIERE and tell him she would do anything he asked her to do.   Jane Doe 1 did as she was assigned, and RANIERE led her to a house across the street.   RANIERE directed her to remove all her clothes and made comments about her naked body.   RANIERE then blindfolded Jane Doe 1, led her into a car and drove her around in a manner that made Jane Doe 1 believe RANIERE was trying to prevent her from knowing where they were going.   RANIERE led Jane Doe 1, still blindfolded, through some trees, into what she believed was a shack, and tied her to a table.   Another person in the room, who Jane Doe 1 did not previously know was present, began performing oral sex on Jane Doe 1 as RANIERE circled the table making comments.   Jane Doe 1 did not want to participate in this sexual activity, but believed it was

part of her commitment to DOS and that if she broke her commitment to DOS her collateral could be released.

46.     Jane Doe 1 was never put on a diet by CC-1, but Jane Doe 1 was 5'5" tall and weighed only 100 pounds before joining DOS, and she then lost some additional weight as a member of DOS due to stress and lack of sleep.

47.     In the following months, RANIERE had repeated sexual contact with Jane Doe 1, including oral sex and sexual intercourse on a number of occasions.   He would take her to a space he called the "Library," which was on the second floor of a house in Clifton Park (the first floor was under construction).   The Library had a hot tub and a loft bed.   RANIERE told Jane Doe 1 that he was CC-1's master and Jane Doe 1's "grandmaster."   RANIERE told Jane Doe 1 that he had conceived the concept of DOS. RANIERE explained to Jane Doe 1 that he could order her to have sex with him, although he claimed that was not what he was doing.   Jane Doe 1 felt, however, that having sex with RANIERE was part of her DOS commitment and that if she broke her commitment to DOS, her collateral might be released.

48.     Jane Doe 1 believed that at some point all the other slaves directly under CC-1, which included CC-2, learned that RANIERE was CC-1's master and their grandmaster.   Throughout Jane Doe 1's time in DOS, CC-1 regularly required her slaves to pose for nude photographs, including on one occasion close-up pictures of their vaginas, either as assignments or collateral.   Jane Doe 1 later learned that CC-1 was sending these photographs to RANIERE, because Jane Doe 1 observed CC-1 sending these photographs using CC-1's cellphone to someone over a messaging service and then receiving responses which CC-1 would sometimes relay to her slaves.   The responses included that the

photographs were not graphic enough or that the slaves were not smiling enough, and that they had to be retaken.   On one occasion, Jane Doe 1 saw a text exchange on CC-1's phone between RANIERE and CC-1, in which CC-1 sent a nude photo she had just taken of all of the slaves on Jane Doe 1's level and RANIERE wrote back, "All mine?" with a smiling devil emoji.

49.     At one point, Jane Doe 1 expressed to RANIERE that she was having difficulty affording the frequent trips to Clifton Park.   RANIERE was frustrated with her and took a bag with $10,000 in cash from a drawer in the Library and asked her if that would make her happy.   Jane Doe 1 began using the cash to pay for her trips, only taking enough for the ticket each time she visited.   On one occasion when she needed money, RANIERE gave her $1,000 from the bag.   Jane Doe 1 also occasionally expressed frustration at having to be celibate and only be sexual with RANIERE, and RANIERE would encourage her to wait a year, which gave Jane Doe 1 some hope that although she could not leave then, she might be able to leave in a year without risking release of her collateral.   Jane Doe 1 stated that when she would bring up the one-year period with RANIERE, he would frequently change the date on which he said the year started.

50.     As part of her DOS assignments, Jane Doe 1 was tasked by CC-1 with reading and reviewing dense articles written by RANIERE that were labeled at the bottom with ESP's copyright.   Each article took hours to review and Jane Doe 1 was tasked with reviewing up to approximately 95 articles.   Jane Doe 1 was required to fill out a standardized form after reading each article, which appeared designed to determine whether the articles were appropriate to include in the ESP curriculum or if there were further edits that needed to be made in order for them to be useful to students.   Jane Doe 1 also received

an assignment from CC-1 to transcribe interviews given by a long-term sexual partner of RANIERE's, who had died, in preparation for that woman's memorial service.   Jane Doe 1 was awake for 23 hours straight completing that project, and RANIERE exchanged messages with her throughout the night encouraging her to stay awake and complete the assignment. RANIERE also directly tasked Jane Doe 1 with an assignment to befriend and learn information about an ostracized member of the ESP/Nxivm community.   As part of this plan, RANIERE directed Jane Doe 1 to make a false social media profile and eventually to meet this ostracized member of the community in person.   Jane Doe 1 believed that each one of these assignments was part of her commitment to DOS and that if she failed at her commitment to DOS, her collateral could be released.

51.   After the May 2017 incident, as described in paragraph 33, because other DOS members had left without having had (to Jane Doe 1's knowledge) their collateral released, Jane Doe 1 began to believe she might also be able to leave without having her collateral released.   When she told CC-1 and CC-2 that she was leaving DOS, they engaged in a two-hour "intervention," during which Jane Doe 1 was berated for leaving.   Throughout the conversation, Jane Doe 1 sought assurances about her collateral.   Although CC-1 and CC-2 never directly said her collateral would not be released, she felt assured enough that as long as she did not speak out about DOS (as opposed to just breaking her lifetime commitment), her collateral would not be released.   After the intervention, RANIERE met Jane Doe 1 and told her she needed to return the money he had previously given her.

VII.   Sex Trafficking of Jane Doe 2

52.   Jane Doe 2 is an actress and model who began taking Nxivm classes in or about 2016, during which time she became friendly with CC-2.   When Jane Doe 2 was in

Clifton Park for a Nxivm class in or about November 2016, CC-2 invited Jane Doe 2 on a walk.  As they walked, CC-2 told Jane Doe 2 that she was part of a secret society that had transformed CC-2's life and enabled CC-2 to uphold CC-2's commitments.   CC-2 told Jane Doe 2 that in order to learn more, Jane Doe 2 had to provide collateral, which Jane Doe 2 did in the form of a video in which Jane Doe 2 divulged a damaging secret.   After providing this video, CC-2 told Jane Doe 2 about DOS and Jane Doe 2 agreed to become CC-2's slave.

53.   Eventually CC-2 told Jane Doe 2 that CC-1 was CC-2's master and thus Jane Doe 2's grandmaster.   When Jane Doe 2 was introduced to DOS, she was living in Los Angeles, California.   After Jane Doe 2 joined DOS, CC-1 suggested that Jane Doe 2 temporarily move to Clifton Park, New York and spend more time with CC-1 and CC-2.   Jane Doe 2 began spending more time in Clifton Park, but regularly traveled back to Los Angeles for jobs.   When Jane Doe 2 would travel between Los Angeles and Clifton Park, she would regularly fly into John F. Kennedy International Airport in Queens, New York before taking the train or bus to Albany.

54.   Two of Jane Doe 2's first acts of self-denial were to refrain from sex and masturbation.

55.   At one point when Jane Doe 2 was in Clifton Park, RANIERE sent Jane Doe 2 a message in the middle of the night asking her to go on a walk with him.   During the walk, RANIERE told Jane Doe 2 sexual jokes.   Over the course of several walks, Jane Doe 2 expressed to RANIERE that she wanted to open a T-shirt business.   RANIERE expressed interest and told her he would partner with her.   Jane Doe 2 left for Los Angeles for a job and while she was there RANIERE sent her a text message saying, "If you want to start this business with me then come back, the sooner the better."

56.    Jane Doe 2 returned to Clifton Park.   She was soon given new assignments, including being kept on a regimented diet of 860-1000 calories per day.   After several months, Jane Doe 2 received a text message from CC-1 stating that CC-1 wanted to speak to Jane Doe 2 about a "special assignment."   CC-1 and CC-2 then contacted Jane Doe 2 and told her the assignment was to "seduce Keith" and have him take a picture of Jane Doe 2 to prove she had done it.   CC-1 told Jane Doe 2 that this assignment was a privilege that few women had the honor of experiencing, but that CC-1 and CC-2 both had.   At the end of the call CC-1 told Jane Doe 2, "I give you permission to enjoy it," which Jane Doe 2 interpreted to mean, "I give you permission to enjoy sex with RANIERE."   Not suspecting that RANIERE was involved with DOS until this call, Jane Doe 2 asked CC-1 on the call if RANIERE knew about DOS.   CC-1 said that he did not.

57.    After the call, in an effort to avoid having sex with RANIERE, Jane Doe 2 made arrangements to leave DOS.   Jane Doe 2 retrieved a car that she had loaned to CC-1 and her cat and possessions from Clifton Park.   Before defecting, Jane Doe 2 also captured images of collateral belonging to other DOS members, including CC-2, from an online Dropbox account, believing that she could protect the release of her own collateral by having other DOS members' collateral as leverage.   Jane Doe 2 officially left DOS in or about May 2016.

WHEREFORE, your deponent respectfully requests that an arrest warrant be issued for the defendant KEITH RANIERE so that he may be dealt with according to law. Your affiant further requests that this affidavit and any associated arrest warrant be filed

under seal, because public filing would give the target of the investigation an opportunity to

flee, to destroy evidence and to harm or threaten witnesses.

MICHAEL LEVER
Special Agent, Federal Bureau of Investigation

Sworn to before me this
14 day of February, 2018

THE HONORABLE LOIS BLOOM
UNITED STATES MAGISTRATE JUDGE
EASTERN DISTRICT OF NEW YORK